SANTANA, Appellee and Cross–Appellant,

v.

AUTO OWNERS INSURANCE COMPANY, Appellant and Cross–Appellee.

[Cite as *Santana v. Auto Owners Ins. Co.* (1993), 91 Ohio App.3d 490.]

Court of Appeals of Ohio,
Lucas County.

No. L–92–262.

Decided April 30, 1993.

*John B. Fisher*, for appellee and cross-appellant.

*Keith J. Watkins*, for appellant and cross-appellee.

---

ABOOD, Judge.

These are cross-appeals from a judgment of the Lucas County Court of Common Pleas entered in favor of appellee/cross-appellant, Pamela Santana ("appellee"), on cross-motions for summary judgment in an action brought by Santana to declare her rights under the uninsured motorist provision of an insurance policy issued to her mother, Marilyn Windnagle, by appellant/cross-appellee, Auto Owners Insurance Company ("Auto Owners").

Appellant sets forth the following single assignment of error:

"The court below erroneously ·determined, to the prejudice of Appellant, that Appellee was entitled to un[der]insured motorist coverage, and should have determined under its own reasoning that Appellee was not entitled to un[der]insured motorist coverage under the insurance policy provision at issue."

Appellee sets forth the following as "assignments of error" in support of her cross-appeal:

"Assignment of Error No. 1

"The trial court erred in finding that the term 'car' was not ambiguous.

"Assignment of Error No. 2

"The trial court did not err in finding that appellee/cross-appellant Pamela Santana's car was permanently disabled."

The facts that are relevant to a determination of the issues raised by these appeals are undisputed. On December 19, 1988, appellee, Pamela Santana, was injured in an automobile accident. At the time, Santana was driving a car owned by her then-finance, Joseph Owens, and was living with her mother, Marilyn Windnagle. The other car in the accident was uninsured. After exhausting the limits of Owens' insurance coverage, she notified her mother's insurance company, Auto Owners, of her intent to pursue an underinsured claim under the policy that it had issued to her mother and that was in effect on the day of the accident. Auto Owners denied coverage to Santana based on the following policy language:

"If you are an individual, we extend this coverage. We will pay bodily injury damages which you are legally entitled to recover from the owner or driver of any uninsured motor vehicle. *We give this same protection to any relative living with you who does not own a car.*" (Emphasis added.)

At the time of her accident, Santana owned an inoperable 1979 Trans Am. On November 13, 1991, Santana filed a complaint for declaratory judgment which " * * * prays for this Court to issue a judgment declaring that the Defendant is obligated to provide coverage to the Plaintiff for her injuries, pursuant to the terms of the subject automobile insurance policy * * *." On November 22, 1991, Auto Owners filed its answer and a counterclaim for declaratory judgment which " * * * demands a judgment declaring that Plaintiff is not an insured under the Auto–Owners insurance policy at issue herein, and that there is no coverage for the claims asserted by Plaintiff * * *." Thereafter, the parties filed cross-motions for summary judgment. In support of the motions, the parties filed Santana's deposition taken September 11, 1991, her affidavit and her responses to Auto Owners' request for admissions which contain the following undisputed facts as to the ownership and condition of the 1979 Trans Am. Several years before her accident, Santana had purchased the Trans Am and obtained liability insurance for it. Between the summer of 1987 and April 14, 1988, however, the Trans Am was without an engine and Santana did not carry the liability insurance on it. After the engine was replaced in April, Santana again purchased insurance but cancelled it one month later, on May 18, 1988. Either at that time or in September 1988, the engine was again removed from the Trans Am which remained on blocks at Windnagle's house until after the accident. The engine was put back in the car in June 1989.

On June 22, 1992, the trial court filed its opinion and judgment entry which granted appellee's motion for summary judgment, denied appellant's motion for summary judgment and declared that Santana is entitled to coverage under the underinsured provisions of the Auto Owners policy purchased by her mother. In

so doing, the trial court found: (1) " * * * the term 'car' is not ambiguous and includes a temporarily inoperable car"; (2) " * * * a car which is permanently inoperable is not a 'car' for purposes of the policy provision at issue here * * * "; (3) Santana's Trans Am " * * * was, for all practical purposes, permanently disabled"; and (4) " * * * it follows that Ms. Santana's Trans Am was not a 'car' and that she is, therefore, entitled to coverage * * *." In finding that the term "car" is not ambiguous, the trial court stated that in "[a]pplying these [general contract] principles, the courts in *Miller v. Shelby Mut.* [*Ins. Co.* (1969), 20 Ohio App.2d 323, 49 O.O.2d 451, 253 N.E.2d 801], and *Harshbarger* [*v. Meridian Mut. Ins. Co.* (1974), 40 Ohio App.2d 296, 69 O.O.2d 272, 319 N.E.2d 209], both found that the term 'automobile' in an insurance policy was not ambiguous. It included, at the very least, temporarily inoperable automobiles." In finding that the Trans Am was permanently inoperable, the trial court stated as follows:

"These facts indicate that the car was completely inoperable for a period of somewhere between eight and eleven months surrounding the date of the accident. They also indicate that when the car was inoperable, Ms. Santana carried automobile insurance, but that when the car was not operable, she did not. Thus, this case is different from that of someone whose car is in the repair shop for a day or even a week or two. For long stretches of time, Ms. Santana simply did not own a car in any sense other than maintaining title."

It is from this judgment that appellant brings its appeal and appellee brings her purported cross-appeal.

In support of its assignment of error, Auto Owners argues: (1) " * * * the word 'car' as used in its policy of insurance *is not ambiguous* * * * "; (2) the definition of "car" clearly includes vehicles that are temporarily disabled; (3) Santana's Trans Am was only temporarily disabled because it was being repaired at the time of the accident and she intended to use it after repairing it; and (4) Santana owned a car on the day of her accident and is not entitled to underinsured coverage under the policy provision of her mother's insurance which only extends coverage to " * * * any relative living with you who does *not* own a car."

In support of her assignments of error, appellee argues: (1) the word "car" is ambiguous because "[t]he policy at issue herein does not address whether operability of a vehicle affects its status as a 'car' under its terms"; (2) ambiguous terms must be construed strictly against the insurer and in favor of the insured; (3) the purpose or intent of the "own-other-cars" provision is to prevent " * * * insuring more than one insurable risk for only one premium"; (4) an auto that is disabled for all "practical" purposes poses no insurable risk; and (5) the condition of the Trans Am posed no insurable risk and was, therefore, not a "car." Santana also " * * * believes that this Court could find that the term 'car' is not

ambiguous and that it clearly does not include an incapacitated object having no engine, or an historical display piece posing no liability insurance risk."

This court will address all assignments of error together since they all relate to the broad issue of whether, and on what basis, Santana is or is not covered under the underinsured motorist provision of her mother's Auto Owners insurance policy. In particular, this court must determine whether Santana's 1979 Trans Am was a "car" as that word is defined in the underinsured motorist provision of the Auto Owners policy.

■ " 'The first general maxim of interpretation * * * is, that it is not allowable to interpret what has no need of interpretation.' " *Lawler v. Burt* (1857), 7 Ohio St. 340, 350. If a term is clear and unambiguous, " * * * this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 406, 374 N.E.2d 146, 149. In the absence of ambiguity, therefore, the terms of the policy must simply be applied " ' * * * according to its terms without engaging in construction * * *.' " *Hartford Ins. Co. v. Occidental Fire & Cas. Co.* (C.A.7, 1990), 908 F.2d 235, 238, quoting *Arkwright–Boston Mfrs. v. Wausau Paper Mills Co.* (C.A.7, 1987), 818 F.2d 591, 594.

■ The test for determining whether language used in an insurance policy is ambiguous is whether that language is " * * * reasonably susceptible of more than one interpretation * * *." *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 519 N.E.2d 1380, syllabus. In making that determination, this court must generally give the words and phrases used their plain, ordinary, natural or commonly accepted meaning. *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167–168, 24 O.O.3d 274, 275–276, 436 N.E.2d 1347, 1348; *Alexander, supra,* paragraph two of the syllabus.

In applying these general contract principles, it is important to emphasize the relationship between the usual meaning of the language used in the contract and the factual situation to which that meaning is to be applied. On the one hand, we must be careful not to find ambiguity merely because the factual situation presents difficulty in applying the common meaning of a word or term used in a contract. "The fact that contractual language may, on occasion, pose difficult factual applications does not make that language ambiguous." *Hartford Ins. Co., supra,* 908 F.2d at 239. On the other hand, we must be careful not to pervert or extend the ordinary meaning of contractual language in an effort to apply it to factual situations that present " * * * a 'gray area' * * * in which the definition is reasonably susceptible of more than one interpretation." *Morris v. Continental Ins. Cos.* (1991), 71 Ohio App.3d 581, 589, 594 N.E.2d 1106, 1111–1112;

*Robson v. Lightning Rod Mut. Ins. Co.* (1978), 59 Ohio App.2d 261, 265, 13 O.O.3d 268, 270, 393 N.E.2d 1053, 1055–1056. In such a case, "[b]ecause application of the plain and ordinary meaning of the terms at issue * * * fails to reveal the scope of the coverage provided by the policy, the definition * * * is ambiguous." *Id.*

The interpretation of contractual language is generally a matter of law for the court. *Alexander, supra,* paragraph one of the syllabus. Where the court finds that language contained in a contract of insurance is reasonably susceptible of more than one interpretation, it will construe that language " * * * strictly against the insurer and liberally in favor of the insured." *King, supra,* syllabus.

In order to determine whether Santana's 1979 Trans Am was a "car" as that word is used in the subject policy provision, we must first determine whether that term is ambiguous.

While the word "car" is not defined in the policy, the term "private passenger car" is defined as " * * * a four-wheel private passenger * * * auto." In turn, "automobile" is defined by the policy as " * * * a four-wheel private passenger automobile * * *."

The relevant definitions offered by lexicographers are as follows. "Car" is defined as " * * * 1: a vehicle moving on wheels * * * c: AUTOMOBILE * * *." Webster's Ninth New Collegiate Dictionary (1989) 205. "Vehicle" is defined as " * * * a means of carrying or transporting something * * * a: MOTOR VEHICLE." *Id.* at 1307. The definition of "automobile" is a " * * * four-wheeled automotive vehicle designed for passenger transportation and commonly propelled by an internal-combustion engine using a volatile fuel." *Id.* at 118. "Automotive" means "1: of, relating to, or concerned with self-propelled vehicles or machines 2: SELF–PROPELLED." *Id.* "Self-propelled" is defined as " * * * containing within itself the means for its own propulsion." *Id.* at 1067.

The only Ohio cases dealing with the definition of "automobile" in a policy of insurance as applied to inoperable vehicles are *Miller, supra,* and *Harshbarger, supra.* In *Miller,* the Mahoning County Court of Appeals found that the word "automobile," defined by the policy of insurance in that case as a "four wheel land motor vehicle designed for use principally upon public roads," unambiguously includes an inoperable 1956 Chevrolet with a "blownout" engine, which its owner intended to use after repairing, even though the Chevrolet sat idle for four months.

The dissent in *Miller* initially stated that "I agree with the majority opinion that this is not a case of construction of an ambiguous insurance contract." *Miller, supra,* 20 Ohio App.2d at 326, 49 O.O.2d at 453, 253 N.E.2d at 803. Yet,

in the body of the dissent, that judge stated that there is no difference in legal result between an automobile with an inoperable engine that cannot be repaired with reasonable cost and effort, and one with no engine; and that neither could be a motor vehicle, because "[s]uch an automobile could not operate upon public roads and could, in no conceivable way, *increase the risk of the insurance policy at issue.*" (Emphasis added.) *Id.* at 327, 49 O.O.2d at 453, 253 N.E.2d at 803. The dissent concluded as follows:

" * * * I feel that the father of plaintiff *reasonably believed* that he had this coverage for his son and that most reasonable fathers would arrive at the same conclusion.

"Therefore, it is my conclusion that plaintiff was covered by the uninsured motorist coverage of his father's insurance policy at the time he was injured, by a reasonable *interpretation* of the language of this insurance policy under the facts in this case." (Emphasis added.) *Id.* at 328, 49 O.O.2d at 454, 253 N.E.2d at 804.

In *Harshbarger,* the Greene County Court of Appeals found that the word "automobile," as used in a "newly acquired automobile" provision of an insurance policy, does not include *permanently* disabled vehicles or vehicles which are not used for travel on the roads and highways. That court explained, as did the dissenting judge in *Miller,* that:

" * * * clunkers which are not mobile or operable so *as to give rise to any insurable risk* are not considered 'automobiles' *within the contemplation of the contracting parties,* and * * * cannot reasonably be related to the *purpose* of the 'newly acquired automobile' clause of the policy." (Emphasis added.) *Harshbarger,* 40 Ohio App.2d at 298, 69 O.O.2d at 273, 319 N.E.2d at 211.

The analysis adopted by the dissent in *Miller* and by the court in *Harshbarger* is more fully explained by the Wisconsin Court of Appeals in *State Farm Mut. Auto. Ins. Co. v. Rechek* (1985), 125 Wis.2d 7, 10–11, 370 N.W.2d 787, 789–790, as follows:

" * * * The term 'designed for use' is reasonably or fairly susceptible to more than one construction. There is nothing in the policy language, for instance, specifically excluding or including inoperable cars within the above definition. A vehicle, while closely resembling an automobile visually, may have no functional similarity and may therefore be incapable of 'independent' movement. *See Travelers Indemnity Co. v. Duffin,* 28 Mich.App. 142, 184 N.W.2d 229, 231 (1970), *rev'd on other grounds,* 384 Mich. 812, 184 N.W.2d 739 (1971). Since an automobile designed for use carries within itself a source of power, lack of that power may render it to be something other than what it was designed for.

"We thus deem that the language of the policy calls for construction. * * *

"The purpose of the policy provision in question is to provide 'drive-other-cars' liability coverage to a resident relative so long as the relative does not acquire and operate his or her own auto. In that case, the relative should insure his or her own vehicle and thereby obtain 'drive-other-cars' coverage through the independent policy. The principal purpose of an independent policy for the relative who obtains an automobile is to provide coverage for that automobile should it become involved in an accident or other mishap. *See Glens Falls Insurance Co. v. Gray,* 386 F.2d 520, 524–25 (5th Cir.1967). Without these limitations, a person could purchase just one policy on only one automobile and cover relatives using other automobiles frequently driven or at least having the opportunity to be driven. *Quinlan v. Coombs,* 105 Wis.2d 330, 332, 314 N.W.2d 125, 127 (Ct.App.1981).

"It is reasonable for a relative to believe that an automobile, unintended for use unless or until major repairs are made, is an unlikely candidate for liability insurance. Since we construe the policy in favor of insureds, we adopt the majority rule that at some stage in time a vehicle may reach such a condition that it is no longer considered an automobile designed for use on the public highways. *Farmers Insurance Co. of Washington v. Miller,* 87 Wash.2d 70, 549 P.2d 9, 11 (1976)." [1]

In considering decisions of other jurisdictions, it becomes readily apparent that the term "car" is reasonably susceptible of more than one interpretation. The issue of whether the definition of words or phrases in an insurance policy such as "car," "automobile" and "motor vehicle," prefaced or not by the words "private passenger," include inoperable self-propelled vehicles, is the subject of a vast amount of litigation and commentary in states other than Ohio and is not limited to the context of "own-other-car" language in underinsured provisions of automobile insurance policies. It is quite revealing that courts have repeatedly reached varying results on similar facts as to whether these terms are ambiguous and what they mean when applied to inoperable vehicles. Some courts hold that these terms are ambiguous; some hold that they unambiguously include inoperable vehicles; and some hold that they unambiguously exclude inoperable vehicles depending upon the extent of the inoperability. See, *e.g.,* the following annotations: Annotation (1982), 11 A.L.R.4th 475; Annotation (1975), 65 A.L.R.3d 851; Annotation (1960), 74 A.L.R.2d 1264; Annotation (1954), 38 A.L.R.2d 867; Annotation (1950), 12 A.L.R.2d 598.

---

**1.** We note at this juncture that the policy language in *Recheck,* as in *Miller,* defined "automobile" as being *designed* for use on public roads. The policy in this case contains no such definition. We cannot, however, distinguish *Miller* on this basis since the ordinary definition of "automobile" set forth above includes a "four-wheeled automotive vehicle *designed* for passenger transportation." (Emphasis added.) Webster's Ninth New Collegiate Dictionary, *supra,* at 118.

Upon consideration of the foregoing, this court finds preliminarily that: (1) since neither the common nor policy definitions of the word "car" specifically include or exclude operability, that term is reasonably susceptible of more than one interpretation and is, therefore, ambiguous; (2) in light of the purpose of the "drive-other-cars" clause, and construing it most favorably to Santana, at some stage in time and under certain conditions a vehicle may no longer be considered a car, *i.e.*, a four-wheel private passenger automobile; and (3) Santana is not necessarily without coverage pursuant to the underinsured motorist provision of Auto Owners' policy by virtue of owning an inoperable 1979 Trans Am.

■ The next issue for this court to determine is at what stage and under what conditions does a vehicle cease to be a car or an automobile.

In *Harshbarger, supra,* 40 Ohio App.2d at 298, 69 O.O.2d at 273, 319 N.E.2d at 211, the court explained that "[t]hese questions involve a combination of factors (the age and condition of the vehicle, the intent of the policy holder, the cost of repairs, the period of non-use etc.) * * *."

In *Glens Falls Ins. Co. v. A.R. Gray* (C.A.5, 1967), 386 F.2d 520, 524–525, the Fifth Circuit Court of Appeals explained further that:

"The possession of an automobile needing major repairs—which was not intended to be used and was not used until after the repairs were completed during the policy year—can hardly be thought to be ownership for liability insurance purposes, since the principal purpose of such insurance is to provide coverage for an automobile which is to be driven and which may become involved in an accident or other mishap."

In *Quick v. Michigan Millers Mut. Ins. Co.* (1969), 112 Ill.App.2d 314, 318–319, 250 N.E.2d 819, 821, that court summarized as follows:

"In those cases where the circumstances—be they the combination of the degree of disrepair of the car, the intent of the owner, or otherwise—suggest that the nonoperating condition is a mere temporary one, the courts have been inclined to find that the vehicle was an 'automobile' within the terms of the policy. In those cases, where such circumstances suggest either that the inoperable condition is probably permanent, or apt to be of long duration with little reasonable possibility of restoring the car to a condition where it can be driven on the roads, the courts have then tended to find that the vehicle is not an 'automobile' within the terms of the policy.

"Under the circumstances of the this case, we agree with the determination of the trial court. Without repeating all of the indicia here, the car was clearly in such condition that it could not have been made an operating private passenger automobile without incurring inordinate expense for parts and labor. The car was not, at the time of the accident, in such condition that it could have been

driven. We question whether it was such an automobile, at that time, as might be contemplated by reasonable persons to be a private passenger automobile." See, also, *Recheck, supra,* 125 Wis.2d at 11, 370 N.W.2d at 790.

Applying the above principles to the undisputed facts of this case, this court finds further that reasonable minds could only conclude that Santana's 1979 Trans Am, which sat idle and on blocks without an engine for between eight and eleven months, did not give rise to an insurable risk and, therefore, was not an "other-owned-car" within the contemplation of the underinsured provision of the policy. The trial court did not err, therefore, in finding that Santana is entitled to coverage thereunder.

In accordance with the foregoing, appellant's sole assignment of error is not well taken, appellee-cross-appellant's first assignment of error is found well taken, and appellee-cross-appellant's second assignment of error is found moot and therefore not well taken.

On consideration whereof, this court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. This court finds further that there are reasonable grounds for this appeal and only court costs are assessed against appellant.

*Judgment accordingly.*

GLASSER, P.J., and MELVIN L. RESNICK J., concur.

## APPENDIX

This matter is before the court on appellant's motion to certify the record of *Santana v. Auto Owners Ins. Co.* (Apr. 30, 1993), Lucas App. No. L–92–262, unreported, 1993 WL 134011, to the Supreme Court of Ohio on the ground that our judgment in *Santana* is in conflict with *Miller v. Shelby Mut. Ins. Co.* (1969), 20 Ohio App.2d 323, 49 O.O.2d 451, 253 N.E.2d 801.

Both cases involve the issue of whether the word "car," as used in an insurance policy that extends uninsured/underinsured motorist coverage to a household resident relative, unambiguously includes nonoperable automobile vehicles. In *Santana,* we found the term "car" to be ambiguous " * * * since neither the common nor policy definitions of the word 'car' specifically include or exclude operability * * *." We then found that, pursuant to the principal purpose for such insurance, an inoperable automotive vehicle is not necessarily a "car." We held that under the facts of the case, " * * * Santana's 1979 Trans Am, which sat idle and on blocks without an engine for between eight and eleven months, did not give rise to an insurable risk and, therefore, was not an 'other-owned-car' within the contemplation of the underinsured provision of the policy." We relied in part on *Glen Falls Ins. Co. v. A.R. Gray* (C.A.5, 1967), 386 F.2d 520, 524–525,

to illustrate that an automobile needing major repairs is not a "car" where the *present* intent of the owner is not to use it until the repairs are completed. Santana had removed all insurance on her Trans Am and it was undisputed that she did not use it until after the repairs had been completed.

*Miller*, however, reached a contrary result on substantially similar facts. *Miller* found that the word "car" was not ambiguous, and that an inoperable automobile is within the meaning of "car" if the owners' intent is to *eventually* repair and use it.

Finding that *Santana* and *Miller* render conflicting judgments on the same question, we conclude that appellant's motion is well taken. Pursuant to Section 3(B)(4), Article IV, Ohio Constitution, this court certifies the record of the instant case to the Supreme Court of Ohio for review and final determination.

*Judgment accordingly.*

ABOOD, MELVIN L. RESNICK and SHERCK, JJ., concur.