RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0105p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

IN RE: FIFTH THIRD EARLY ACCESS CASH ADVANCE LITIGATION.

---

LORI LASKARIS; DANIEL LASKARIS; JESSIE MCQUILLEN; BRIAN C. HARRISON; JANET FYOCK; WILLIAM R. KLOPFENSTEIN; ADAM MCKINNEY; DONALD E. ADANICH; LYN A. ADANICH; SCOTT D. LITTLE; DIANA HORN, on behalf of themselves and all others similarly situated,

> *Plaintiffs-Appellants*,

    *v.*

FIFTH THIRD BANK,

> *Defendant-Appellee*.

No. 18-3390

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:12-cv-00851—Michael R. Barrett, District Judge.

Argued: January 29, 2019

Decided and Filed: May 28, 2019

Before: SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Rachel Bloomekatz, GUPTA WESSLER PLLC, Washington, D.C., for Appellants. Daniel R. Warren, BAKER & HOSTETLER LLP, Cleveland, Ohio, for Appellee. **ON BRIEF:** Rachel Bloomekatz, GUPTA WESSLER PLLC, Washington, D.C., Hassan A. Zavareei, Anna C. Haac, TYCKO & ZAVAREEI LLP, Washington, D.C., Stuart E. Scott, SPANGENBERG SHIBLEY & LIBER LLP, Cleveland, Ohio, Jason K. Whittemore, WAGNER MCLAUGHLIN, Tampa, Florida, for Appellants. Daniel R. Warren, Brett A. Wall, G. Karl Fanter, BAKER &

HOSTETLER LLP, Cleveland, Ohio, for Appellee. J. Carl Cecere, CECERE PC, Dallas, Texas, for Amicus Curiae.

GRIFFIN, J., delivered the opinion of the court in which SUTTON, J., joined, and LARSEN, J., joined in part. LARSEN, J. (pg. 19), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

This putative class action concerns defendant Fifth Third Bank's "Early Access" cash advance loan program, a short-term lending option the bank offered to certain customers who held eligible checking accounts with it. Fifth Third, as both lender and bank, had direct access to borrowers' checking accounts. It deposited Early Access loans straight into borrowers' accounts and then paid itself back automatically—plus a 10% "transaction fee"—after a direct deposit posted or thirty-five days elapsed, whichever came first. The contract governing the program disclosed the annual percentage rate ("APR") as 120% in all cases.

Plaintiffs held checking accounts with Fifth Third and obtained Early Access loans, which were paid back automatically fewer than thirty days later. They contend that the 120% figure is false and misleading, pointing to the contract's novel method for calculating APR—one in which the APR is always the same regardless of the length of the loan. Calculated using a more conventional method, in which the APR is tied to the length of the loan, plaintiffs assert that the APR was in fact as high as 3650%.

Plaintiffs brought a variety of state and federal claims below, but this appeal is limited to a single breach-of-contract claim under Ohio law. The district court granted Fifth Third's Rule 12(b)(6) motion in relevant part and dismissed the breach-of-contract claim, holding that the contract unambiguously disclosed the method for calculating APR despite admitting that the result "may be misleading." On review, we hold that the contract was ambiguous because it provided two different descriptions of "APR" that are inconsistent with each other and cannot be

reconciled. The first was a definition, lifted verbatim from a federal regulation, that describes the APR as being "expressed as a yearly rate"; the second was the method used to calculate it, which is not based on a year or any other time period. The ambiguity raises a question of fact that should be resolved in the district court on remand.

I.

A.

Fifth Third is a state-chartered, federally insured bank headquartered in Ohio, with branches in several states, including Ohio, Michigan, Kentucky, and Tennessee. "Early Access" was a short-term "cash advance" program in which eligible customers who held checking accounts with Fifth Third could obtain a loan up to $1000 deposited directly into their accounts. Plaintiffs describe Early Access as a type of "payday" loan: a "small loan[] due on the borrower's next 'payday.'" Fifth Third disputes this characterization, but admitted in the program's terms and conditions that Early Access "is an expensive form of credit . . . designed to help our customers meet their short-term borrowing needs . . . . We do not recommend continued use of the service."

Early Access was different in that Fifth Third, the lender, also had access to its customers' checking accounts. When a customer requested a cash advance, Fifth Third deposited the amount into that individual's checking account. When a customer later received a direct deposit of $100 or more, Fifth Third automatically deducted the amount of the loan from the account, plus a "transaction fee" equal to 10% of the loan's amount. Fifth Third did this even if the deduction resulted in a negative balance on the account, though it did not charge an overdraft fee for this transaction. Customers also had the option of making manual payments. If the loan had not been repaid in full after thirty-five days, Fifth Third automatically deducted the outstanding balance and the loan's transaction fee from the account, even if no qualifying direct deposit had posted. Thus, the term of the loan was always thirty-five days or shorter.

Two documents explained the contours of the Early Access program: the "Summary of Key Features and Terms & Conditions" and the "Frequently Asked Questions," which were incorporated into the terms and conditions by reference (collectively, "the contract"). According to plaintiffs, the contract here was one of adhesion, as it was "drafted and imposed by Fifth Third" and "presented to . . . customers on a 'take it or leave it' basis." The contract explained that "there is no interest charge associated with an Advance," and customers are charged the same 10% transaction fee regardless of the length of the term. It included several examples of how this works in practice, including this one:

> Lee Advanced multiple times in the week leading up to payday. She Advanced $20 two times on Monday, $20 on Tuesday, and $40 on Thursday, for a total of $100 in Fifth Third Early Access Advances prior to her next qualifying direct deposit. When Lee receives her next qualifying direct deposit, the bank will withdraw $110 as payment from her Associated Checking Account ($100 in Fifth Third Early Access Advances and $10 in corresponding transaction fees).

In several places, the contract discussed the Early Access program's "annual percentage rate" ("APR"). This term is familiar to many consumers and widespread across the financial sector, undoubtedly because the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and federal regulations "require[] lenders to make certain prominent disclosures when extending credit, including the APR." *Rucker v. Sheehy Alexandria, Inc.*, 244 F. Supp. 2d 618, 622 (E.D. Va. 2003); *see* Truth in Lending Regulations, Regulation Z, 12 C.F.R. § 226.1 *et seq.* TILA specifically requires that lenders use the term "annual percentage rate." 15 U.S.C. § 1638(a)(4). One regulation defines "annual percentage rate [a]s a measure of the cost of credit, expressed as a yearly rate." 12 C.F.R. § 226.14(a). Another provides a bit more detail: "[t]he annual percentage rate is a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 1026.22(a)(1).

The contract described the APR for the Early Access program as follows:

**INTEREST RATE AND FEES**

**Interest Rate**

| | |
|---|---|
| Annual Percentage Rate (APR) for Cash Advances | 120% |

**Fees**

| | |
|---|---|
| Annual Fee | None |
| Transaction Fees<br>• Cash Advance | 10% of the amount of each cash Advance |
| Penalty Fees<br>• Late Payment<br>• Over-the-Credit Limit | None<br>None |

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided on page 5 of this Agreement.

**Transaction (Cash Advance) Fee:** A 10% transaction fee will be assessed for each dollar that you Advance through your Fifth Third Early Access account feature. For example, for every $10 that you Advance, the transaction fee will be $1; without regard to how long the Advance remains outstanding. This transaction fee will be reflected as an **Annual Percentage Rate (APR)** in the Fifth Third Early Access section of your checking account statement. The **APR** is a measure of the cost of credit, expressed as a yearly rate. The **Annual Percentage Rate** is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, $100 Advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = **120% APR.**

The 120% APR also appeared on the monthly bank statements Fifth Third provided to its customers. After clarifying its use of "APR" as an abbreviation for "Annual Percentage Rate," the contract explained that "[t]he APR is a measure of the cost of credit, expressed as a yearly rate." It also stated that "[w]e show the Annual Percentage Rate (APR) for Fifth Third Early Access so our customers can compare the cost of using this product against other forms of credit." But the formula it provided for calculating APR is unique, arrived at by "dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, $100 Advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = 120% APR." The result is that the APR calculated this way is always 120%, regardless of the length of the loan.

Plaintiffs all held checking accounts with Fifth Third, sought and obtained loans through the Early Access program, and paid back their loans fewer than thirty days after receiving

them—usually by automatic deduction when a direct deposit posted to their accounts. They contend that Fifth Third's disclosure of 120% APR is false and misleading because "Early Access Loans carry a 120% APR only when repaid in [exactly] 30 days," and in practice, the APR is usually much higher, with an upper limit of 3650%. Plaintiffs assert that Fifth Third "has made up a formula that always yields 120% and calls it the 'APR,' even though the 120% number is completely arbitrary and bears no relation to the annual cost of the Early Access credit." They essentially accuse Fifth Third of running a "bait and switch" scheme, suggesting that the listed APR is comparable to APRs shown by other lenders before changing the meaning of "APR" in the contract to make its terms appear more favorable than they are. Similarly, amici argue that the contract's APR is not really an APR at all, because "a *true* APR must be tied to the actual length of time the loan balance is outstanding."

B.

Plaintiffs William R. Klopfenstein and Adam McKinney filed a complaint against Fifth Third in the United States District Court for the Northern District of Ohio. Their case was eventually transferred to the Southern District of Ohio and consolidated, pursuant to Federal Rule of Civil Procedure 42(a)(2), with four other cases that also originated elsewhere. Plaintiffs' post-consolidation amended complaint asserted eighteen causes of action, some on behalf of the entire proposed class and others on behalf of proposed state-specific subclasses. Relevant to this appeal, Count One pleaded violations of TILA and Regulation Z, and Count Four pleaded breach of contract.[1] Specifically, Count Four alleged that Fifth Third breached the terms of the Early Access Loans contract "by charging Plaintiffs and the other Class members APRs in excess of 120% on Early Access Loans," and "by failing to provide an accurate APR summary for Early Access Loans on monthly bank statements."

Fifth Third moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted Fifth Third's motion in part and dismissed every claim except Count One. *Klopfenstein v. Fifth Third Bank*, No. 1:12-cv-851, 2015 WL 1468382, at *1 (S.D. Ohio Mar. 30, 2015). In its brief discussion of the breach-of-contract claim, the court

---

[1]While the complaint did not specify in which state's laws it bases the breach-of-contract claim, the contract's choice-of-law provision makes clear that Ohio law applies.

noted that the APR provision "may be misleading because not every transaction is paid in twelve cycles," but concluded that the contract was "unambiguous in [its] explanation as to the method for calculating the APR." *Id.* at *7. Because plaintiffs did not dispute that they were charged the 10% transaction fee regardless of the length of their loans, the district court found that no breach occurred and dismissed the claim. *Id.*

Plaintiffs sought reconsideration pursuant to Federal Rule of Civil Procedure 59(e). After holding a status conference and discussing a possible settlement agreement with the parties, the court denied the motion as moot, subject to refiling. The parties then engaged in discovery and "extensive [c]ourt-mediated settlement discussions." *In re Fifth Third Early Access Cash Advance Litig.*, No. 1:12-cv-851, 2018 WL 1521771, at *1 (S.D. Ohio Mar. 28, 2018). The parties also entered into a "preliminary Memorandum of Understanding" to settle the case. *Id.* Once discovery revealed that the contract claim's damages were much higher than expected— and "exponentially higher than the potential TILA damages due to TILA's statutory caps"— settlement negotiations stalled and the parties were ultimately unable to reach an agreement. *Id.*

Plaintiffs then moved for the entry of a final judgment with respect to only the dismissed breach-of-contract claim, pursuant to Federal Rule of Civil Procedure 54(b). This rule "permits immediate appellate review of a district court's judgment even though the lawsuit contains unresolved claims." *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 442 (6th Cir. 2004). Fifth Third opposed the motion. After finding that the TILA and breach-of-contract counts were sufficiently distinct, and that there was no just reason for delay, the district court granted plaintiffs' motion, certified the breach-of-contract claim for entry of a final judgment, and stayed the rest of the case pending appeal. *Early Access Litig.*, 2018 WL 1521771, at *2–4.

II.

Fifth Third argues that the district court improperly certified the dismissed breach-of-contract claim as a final judgment under Rule 54(b). If Fifth Third is correct, then this court lacks jurisdiction to review the merits of this appeal. *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005). Appellate jurisdiction under 28 U.S.C. § 1291 is limited to "final decisions" and, "[f]or the most part, a district court's decision counts as 'final' only if it takes

care of all claims and all parties in the case." *Adler v. Elk Glenn, LLC*, 758 F.3d 737, 739 (6th Cir. 2014) (Sutton, J., concurring). If a case involves multiple claims or parties, however, a district court may "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Rule 54(b) thus allows immediate appellate review of some claims while the rest of the case remains in the district court. "This exception pays tribute to the reality that the benefits of immediate appeals on occasion exceed the costs." *Adler*, 758 F.3d at 739 (Sutton, J., concurring).

Certification of a claim under Rule 54(b) has two steps. "First, the district court must expressly direct the entry of final judgment as to one or more but fewer than all the claims or parties in a case. Second, the district court must expressly determine that there is no just reason to delay appellate review." *Gen. Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994) (cleaned up). "We review de novo the district court's conclusions on the first inquiry and for abuse of discretion the district court's finding of no just reason for delay." *EJS Props., LLC v. City of Toledo*, 689 F.3d 535, 537 (6th Cir. 2012).

## A.

Determining whether the district court "direct[ed] entry of a final judgment as to one or more, but fewer than all, claims" is trickier than it sounds, because in this context, "claim" is a term of art. As the district court explained, the parties' "dispute centers on whether the contract claims and the TILA claim should be considered a single 'claim.'" *Early Access Litig.*, 2018 WL 1521771, at *2. Here we apply the "operative facts" test, which defines a "'claim' under Rule 54(b) '[as] the aggregate of operative facts which give rise to a right enforceable in the courts' even if the party has raised different theories of relief." *Olin Corp.*, 390 F.3d at 442 (quoting *Gen. Acquisition*, 23 F.3d at 1028). In applying this test, we examine the causes of action as pleaded in the complaint and consider whether they "seek to recover for the same underlying injury." *Lowery*, 426 F.3d at 821. While remaining mindful that Rule 54(b) represents an exception to "the historic federal policy against piecemeal appeals," *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956), this court has also cautioned against

applying the operative facts test "too broadly," *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 501 (6th Cir. 2012).

Fifth Third chiefly relies on *Lowery v. Federal Express Corp.* in support of its argument that the breach-of-contract and TILA counts represent a single "claim." 426 F.3d 817. In that case, we dismissed an appeal certified under Rule 54(b) where the two counts in question were for breach of contract under Tennessee law and retaliation under Title VII. *Id.* at 821. After noting that it is easy to imagine a case in which those two causes of action could involve separate legal rights, the court found that, as pleaded, "both causes of action arose out of the same aggregate of operative facts and seek to recover for the same underlying injury." *Id.* Specifically, "the contractual promise was that [the] plaintiff would not be retaliated against for filing the grievance. That is, the alleged breach *was* the retaliation." *Id.*

This case is different in two critical respects. First, the TILA and breach-of-contract counts stem from different acts or omissions of Fifth Third. In breach-of-contract actions, Ohio law requires, unsurprisingly, that a plaintiff prove a defendant's breach. *Samadder v. DMF of Ohio, Inc.*, 798 N.E.2d 1141, 1147 (Ohio Ct. App. 2003). The complaint alleges that Fifth Third breached by charging plaintiffs APRs higher than 120% on their Early Access Loans and by failing to provide accurate APR summaries on plaintiffs' monthly bank statements. TILA "requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998); *see* 15 U.S.C. § 1631. A cause of action under TILA arises when a defendant fails to make these disclosures, *Beach*, 523 U.S. at 412, and plaintiffs' complaint here alleges as much. Thus, "[t]he TILA claim does not involve the obligations created by the underlying contract." *Maddox v. Ky. Fin. Co.*, 736 F.2d 380, 382 (6th Cir. 1984) (discussing *Whigham v. Beneficial Fin. Co. of Fayetteville*, 599 F.2d 1322 (4th Cir. 1979)); *see also Lea v. Buy Direct, L.L.C.*, 755 F.3d 250, 253 (5th Cir. 2014) ("TILA is a disclosure law designed to protect consumers and does not implicate the duty of subsequent performance on the relevant contract or contracts." (internal quotation marks omitted)). While the breach-of-contract claim focuses on the amount of money that Fifth Third charged plaintiffs, the TILA claim is based on different conduct: failure to make required disclosures.

Second, each count seeks to recover damages that stem from separate injuries. In a breach-of-contract action under Ohio law, a plaintiff must prove "damages or loss resulting from the breach," *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 104 N.E.3d 1076, 1083 (Ohio Ct. App. 2018), and "the amount of damages awarded must correspond to injuries resulting from the breach," *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio Ct. App. 1996). But "[a] plaintiff in a TILA case need not prove that he or she suffered actual monetary damages in order to recover the statutory damages and attorney's fees." *Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 800 (6th Cir. 1996). "Rather, the TILA claim enforces a federal policy regarding disclosure by invoking a penalty." *Maddox*, 736 F.2d at 382. Plaintiffs' complaint tracks these differences, requesting not only actual damages, but also statutory damages, attorney's fees, and costs under TILA. In this way, the damages sought in each count are grounded in different places.

To be sure, each count is not entirely divorced from the other. For example, the complaint alleges that Fifth Third "breached the contract by failing to provide an accurate APR summary for Early Access Loans on monthly bank statements." Similarly, the TILA count alleges that Fifth Third "did not provide accurate and meaningful APR disclosures to Plaintiffs regarding Early Access Loans." But claims can be separate for the purposes of Rule 54(b) "despite the presence of some overlap," and under the operative facts test, the differences between plaintiffs' TILA and breach-of-contract counts as pleaded "sufficiently outweigh what they have in common." *DeWine*, 696 F.3d at 502. "Because each count involves distinct facts relating to separate injuries, each count is a separate claim for purposes of Rule 54(b)." *Id.*

B.

While Fifth Third challenges only the first part of the district court's ruling on certification, we must review the entire decision to determine whether this court has appellate jurisdiction. *See Lowery*, 426 F.3d at 820. Determining whether there is no just reason for delay under Rule 54(b) "requires the district court to balance the needs of the parties against the interests of efficient case management." *Gen. Acquisition*, 23 F.3d at 1027. This court has provided the following, non-exhaustive list of factors that a district court should consider:

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense and the like.

*Id.* at 1030 (quoting *Corrosioneering, Inc. v. Thyssen Envtl. Sys., Inc.*, 807 F.2d 1279, 1283 (6th Cir. 1986)).

Here, the district court discussed each of the above factors, applied them to this case, and determined that they weighed in favor of certifying the breach-of-contract claim. *Early Access Litig.*, 2018 WL 1521771, at *3. The court also addressed the miscellaneous factors, noting that "the possibility of settling a claim may tip the balance in favor of a partial final judgment under Rule 54(b)." *Id.* (citing *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 n.2 (1980)). Because plaintiffs had moved for reconsideration of the breach-of-contract claim's dismissal—and had "remained steadfast in their position that this Court was incorrect in [that] ruling"—and in light of the extensive settlement discussions undertaken by the parties, the district court found that "if a judgment on the breach of contract claims would facilitate the settlement of the case, it serves efficient judicial administration by conserving judicial time and limited litigation expenses." *Id.* Finally, the court explicitly found that there was "no just reason for delay." *Id.*

The district court did not abuse its discretion in balancing these issues. It "explicitly weighed the non-exhaustive list of factors we have provided for determining whether to find just reason for delay" and reached a reasonable conclusion based on that analysis. *DeWine*, 696 F.3d at 503. Accordingly, we conclude that the district court's certification under Rule 54(b) was proper, and we have jurisdiction to consider the merits of this appeal.

### III.

We review de novo a district court's ruling on a Rule 12(b)(6) motion. *Kaminski v. Coulter*, 865 F.3d 339, 344 (6th Cir. 2017). Accepting all allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor, *Gavitt v. Born*, 835 F.3d 623, 639–40

(6th Cir. 2016), we "must determine whether the allegations plausibly state a claim for relief," *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 308 (6th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true." *Kaminski*, 865 F.3d at 344 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *Claris*, 104 N.E.3d at 1083. Under Ohio law, contract interpretation, including a determination as to whether a contract is ambiguous, is a question of law. *Envision Waste Servs., LLC v. Cty. of Medina*, 83 N.E.3d 270, 275 (Ohio Ct. App. 2017). Courts should interpret contracts "so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Lutz v. Chesapeake Appalachia, L.L.C.*, 71 N.E.3d 1010, 1012 (Ohio 2016) (quoting *Skivolocki v. E. Ohio Gas Co.*, 313 N.E.2d 374, 376 (Ohio 1974)). In doing so, we examine the contract "as a whole" and attempt to "give effect to every provision." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292, 295 (Ohio 2011). "Common words . . . will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument. Technical terms will be given their technical meaning, unless a different intention is clearly expressed." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citation and internal quotation marks omitted).

But if a contract's "language is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning," then it is ambiguous as a matter of law. *Cadle v. D'Amico*, 66 N.E.3d 1184, 1188 (Ohio Ct. App. 2016) (internal quotation marks omitted). "If ambiguity exists . . . the meaning of a contract is a question of fact." *Books A Million, Inc. v. H & N Enters., Inc.*, 140 F. Supp. 2d 846, 854 (S.D. Ohio 2001) (citing *Amstutz v. Prudential Ins. Co. of Am.*, 26 N.E.2d 454 (Ohio 1940)).

A.

Plaintiffs assert that Fifth Third breached the contract "by charging [them] APRs in excess of 120% on Early Access Loans."[2] Fifth Third disagrees, contending that "[t]he agreed-upon meaning of the APR disclosure is set forth in the contract," and Fifth Third's conduct adhered to that definition. Thus, the meaning of the term "APR" is central to this dispute. As discussed above, the contract explains the term "APR" in two ways. First, it states that "APR is a measure of the cost of credit, expressed as a yearly rate," a verbatim recitation of the APR definition found in Regulation Z. *See* 12 C.F.R. § 226.14(a). Then, it explains that "[t]he Annual Percentage Rate is calculated by dividing the transaction fee by the Advance amount and multiplying the quotient by the number of statement cycles within a year. For example, $100 Advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = 120% APR." Plaintiffs argue that these two definitions of the same key term are inconsistent because the actual formula does not produce an APR that is "expressed as a yearly rate." Instead, it always produces an APR of 120%, regardless of the length of the loan term, and, in this way, it is untethered to a year or any other time period.

Plaintiffs provide numerous examples comparing results from the contract's APR formula with results from a different formula for calculating APR that is "expressed as a yearly rate." Plaintiffs do not explicitly provide their alternate formula, but from the complaint's examples, it is easy to discern. Their formula (1) divides the finance charge by the principal loan amount, (2) multiplies the quotient of that by the number of days in a year, (3) divides the product of that by the number of days in the loan term, and (4) multiplies the quotient of that by 100 to get a percentage.[3] The result is what the loan would look like if it were extrapolated to be

---

[2]As mentioned above, the complaint also alleges that Fifth Third "breached the contract by failing to provide an accurate APR summary for Early Access Loans on monthly bank statements." But plaintiffs' briefs barely mention the monthly statements and do not include any argument specific to them or that breach-of-contract theory. "We have repeatedly held that a party forfeits any allegations that lack developed argument." *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677 (6th Cir. 2018). To the extent that this alternate theory is a part of this appeal at all, plaintiffs have thus forfeited it.

[3]The Consumer Federation of America, which has filed an amicus brief in this case, includes a publication on its web site that advocates using this formula in the context of payday loans. Arkansans Against Abusive Payday Lending, *How to Calculate the Interest Rate on Payday Loans*, https://consumerfed.org/pdfs/AAAPL-How-to-Calculate-Interest-Rate.pdf (last visited Apr. 9, 2019).

for a term of one year, or "annualized," and the cost of credit remained the same across that longer term.

For example, the complaint alleges that plaintiff "Fyock borrowed an Early Access Loan in the amount of $650.00 from her Early Access account. Fourteen days later . . . Fyock received a direct deposit and Fifth Third debited $715.00 to repay this Early Access Loan. This resulted in an APR of approximately 260%." Plugged into plaintiffs' formula (and rounded to the hundredths place), the numbers look like this:

$$\frac{\frac{65}{650} \times 365}{14} \times 100 = 260.71\%$$

What this result attempts to explain is that charging $65 to borrow $650 for fourteen days is the cost-of-credit equivalent of charging $1694.64 to borrow the same amount for a whole year. Of course, the terms of the Early Access program don't allow a loan to be outstanding for that long, and even if they did, the "transaction fee" does not increase over time in the way that other types of lending charges, like compound interest, might. But APR and other required disclosures have value because they allow consumers "to compare more readily the various credit terms available . . . and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). "Annualizing" the cost of credit is APR's method of doing so.

Returning to the above example from the complaint, calculating the APR using the formula provided in the contract yields a different result than plaintiffs' formula:

$$\frac{65}{650} \times 12 = 120\%$$

In another example, "[plaintiff] McKinney borrowed an Early Access Loan in the amount of $200. Three days later . . . McKinney received a direct deposit and Fifth Third debited $220 to repay that loan. This resulted in an APR of approximately 1,217% . . . ." Again, the numbers plug into plaintiffs' formula thus:

$$\frac{\frac{20}{200} \times 365}{3} \times 100 = 1216.67\%$$

Using the formula in the contract yields a result different from the above, but identical to the result from the first example:

$$\frac{20}{200} \times 12 = 120\%$$

This extreme example shows a tenfold difference in APR between the two formulas, with the APR from the contract yielding a number that appears much more favorable to the consumer.

But the formula from the contract can also result in a higher APR than the formula used by plaintiffs. If a customer borrowed $100 and a direct deposit never posted to his checking account, Fifth Third would automatically deduct $110 thirty-five days later, resulting in APR of about 104% using plaintiffs' formula:

$$\frac{\frac{10}{100} \times 365}{35} \times 100 = 104.29\%$$

Meanwhile, the contract's formula yields the same result as before, this time, overstating the APR compared to the other formula:

$$\frac{10}{100} \times 12 = 120\%$$

B.

These examples demonstrate that the contract's formula for calculating APR is static, and always the same regardless of the length of the loan. Loans with lengths of three, fourteen, and thirty-five days all receive APRs of 120%. Hence, any APR produced using the contract's formula cannot be "expressed as a yearly rate." Definitions for "yearly" include "pertaining to a year or to each year" and "computed or determined by the year," and the parties do not dispute

that the word is inextricably tied to a period of a time. *Webster's Unabridged Dictionary* 2201 (2001).

In addition to providing an explicit definition, the contract contains other indications that the APR is tied to a year's time. First, the term "APR" itself includes the word "annual," which is defined as "[o]ccurring once every year; yearly," or "[o]f, relating to, or involving a period of one year." *Black's Law Dictionary* 109 (10th ed. 2014). Its presence provides further support to the contract's promise that the APR would be "expressed as a yearly rate." Of course, Fifth Third must include the term "annual percentage rate" in order to comply with TILA's requirements, but that does not mean that the word should be assigned any less meaning or importance as a matter of contract interpretation. The contract does not inform customers that this disclosure is mandatory either. To the contrary, it states that APR is included "so our customers can compare the cost of using this product against other forms of credit." Second, the contract's formula includes as a factor "the number of statement cycles within a year." This detail is perhaps the most misleading of all, signaling to customers that the APR formula is somehow tied to a yearly rate when it is not.

The contract also includes a mathematical error in one of its examples explaining how the APR formula works in practice. The Terms and Conditions document contains the following language: "[f]or example, $100 Advance with a $10 transaction fee = $10/$100 = 0.1% X 12 cycles = 120% APR." But 10 divided by 100 equals 0.1, not 0.1% or 0.001 as it would be expressed without a percentage sign. And 0.001 times 12 equals 0.012 or 1.2%, not 120% as the example states. Fifth Third acknowledged the error at oral argument, but dismissed it as a "typo" stemming from "transposing from percentage to decimal points." In any case, by describing APR in another inconsistent way, this error adds to the uncertainty surrounding the contract's purported meaning of the term.

The contract thus provides multiple descriptions of "APR" that are inconsistent with one another. What complicates things is that one is a definition while another is a formula; the two are naturally expressed in different ways. One might say, for example, that "compound interest" is defined as "interest paid on both the principal and the accrued interest." *Webster's*

*Unabridged Dictionary* 420 (2001). But the method of calculating compound interest might look like this[4]:

$$A = P\left(1 + \frac{r}{n}\right)^{nt}$$

A reasonable person would recognize that the two don't mean exactly the same thing, but would expect them to be consistent. Here, there is no way for the contract's definition of APR to be consistent with the formula it provides.

Fifth Third makes no attempt to explain how the contract's method of calculating APR can be "expressed as a yearly rate." In fact, Fifth Third's counsel confirmed at oral argument that the contract's calculation of "APR has nothing to do with borrowing the money on a yearly basis." Instead, Fifth Third stresses that "the Early Access contract unambiguously provided for a flat transaction fee of 10 percent" and that the "calculation of the APR merely reflected, and did not change, the flat transaction fee" Fifth Third asks us to conclude from these premises that the contract is unambiguous as a matter of law. But this interpretation would require us to ignore the contract's definition of APR as "a measure of the cost of credit, expressed as a yearly rate." Because we must "give effect to every provision," we cannot endorse an interpretation that would read language out of the contract entirely. *Sunoco*, 953 N.E.2d at 295.

## C.

No interpretation of the contract can give effect to one definition that specifies that APR is "expressed as a yearly rate" while also giving effect to a formula that precludes such an expression. Because the term "APR" as it appears in the contract is "reasonably susceptible of more than one interpretation," it is ambiguous as a matter of law. *Santana v. Auto Owners Ins. Co.*, 632 N.E.2d 1308, 1313 (Ohio Ct. App. 1993). And because "the meaning of the ambiguous language is a question of fact," *SPG, Inc. v. First St. Dev., L.L.C.*, 64 N.E.3d 340, 347 (Ohio Ct. App. 2016), it should, "in the first instance, be decided by the district court," *Roth Steel Prods. v.*

---

[4]*See* Compound Interest Calculator, https://www.calculator net/compound-interest-calculator html (last visited Apr. 9, 2019).

*Sharon Steel Corp.*, 705 F.2d 134, 153–54 (6th Cir. 1983).  Accordingly, we do not address the parties' arguments concerning latent ambiguity and other factual issues.  We also decline to consider the parties' numerous arguments based on TILA and Regulation Z.  That claim is not before us and we take no position as to its merits.

## IV.

For these reasons, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge, concurring in part and dissenting in part. I join Part II of the majority opinion, which concludes that we have jurisdiction to consider the merits of this appeal. I depart, however, from my colleagues when it comes to the reading of the parties' contract.

Under Ohio law, parties are free to define the terms in a contract as they see fit, even those that otherwise have well-understood common or technical meanings, so long as the parties' intent is clear. *See Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997). The parties' intent "is presumed to reside in the language they chose to employ in the agreement." *Id.* The contract here defines Annual Percentage Rate (APR) in an idiosyncratic but abundantly clear manner. At all times, the contract expressly ties the APR to the transaction fee and the borrower's statement cycles. The remainder of the contract explains, no fewer than ten times, that the cost of the loan is a flat, 10% transaction fee. The contract also clearly explains that the 10% transaction fee is assessed without regard to the length of time the loan remains outstanding. All plaintiffs were charged the 10% transaction fee—nothing more, nothing less.

Federal law may require that terms like APR be defined and disclosed in a particular way; and to the extent that such requirements apply here, plaintiffs' recourse lies in their Truth in Lending Act (TILA) claim. *See Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (recognizing that the TILA "requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like . . . [APRs]" and provides for "statutory and actual damages traceable to a lender's failure to make the requisite disclosures"). But plaintiffs got the benefit of their bargain, and so their breach of contract claim fails. *See JNT Props., LLC v. Keybank Nat'l Ass'n*, 981 N.E.2d 804, 806–07 (Ohio 2012).

For these reasons, I respectfully dissent in part.