NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0477n.06

No. 21-3428

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| TRESSA SHERROD; JOHN CRAWFORD, JR.; JHC, IV and JC, Minors, John Crawford Jr. as guardian and next friend of JCH, IV and JC, | ) ) ) ) | **FILED**<br>Nov 23, 2022<br>DEBORAH S. HUNT, Clerk |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) ) |  |
| WAL-MART STORES, INC; WAL-MART STORES EAST, LP; WAL-MART STORE #2124, | ) ) ) | OPINION |
| Defendants-Appellees. | ) ) |  |

Before: BATCHELDER, WHITE, and BUSH, Circuit Judges.

WHITE, J., delivered the opinion of the court in which BUSH, J., joined. BATCHELDER, J. (pp. 14–21), delivered a separate dissenting opinion.

**HELENE N. WHITE, Circuit Judge.** In this diversity case, Plaintiffs-Appellants (Sherrod) appeal the dismissal of their wrongful-death claim at summary judgment based on an Ohio statute that restricts wrongful-death claims against property owners. Because a genuine dispute remains regarding whether Sherrod has satisfied the conditions for liability under the statute—whether an alleged failure by Defendants-Appellees (Walmart) to prevent John H. Crawford, III, from carrying a replica assault rifle through a Walmart store provoked a police officer responding to an active-shooter call to shoot and kill Crawford—we REVERSE and REMAND.

I.

A.

On August 5, 2014, Crawford was a customer in Walmart's Beavercreek, Ohio store. He entered the sporting goods department, walked down an aisle where unsecured pellet guns were displayed, and picked up a Crosman MK-177 pellet gun that was unboxed.[1] The MK-177 is a replica of an AR-15 assault rifle.

Crawford then headed to the pet department with the MK-177. Corey Brooks, a paint-department employee working near the sporting goods department, saw Crawford walk by with the MK-177. Brooks called a supervisor, Michaela Menz, to report that Crawford was walking around with "what appeared to be a gun," unboxed and without an orange tip to indicate that it was not real, "so somebody might get freaked out."[2] R. 219 PID 13451–53; R. 226-1 PID 15834. Menz contacted a manager, Denise Wolford, who went looking for Crawford together with another manager, Jessica Thomas. Wolford and Thomas went to the sporting goods department and, after not finding Crawford there, casually walked to the grocery department.

Around the same time, Ronald Ritchie, another customer, called 911 after seeing Crawford with the MK-177. Ritchie reported that Crawford was carrying a rifle, waving it around, and pointing it at customers, including two children. The 911 dispatcher reported to responding police that Crawford had loaded the gun.[3]

---

[1] Video footage shows an individual unpackaging the pellet gun earlier that day, two individuals handling the gun before Crawford did, and additional individuals who appear to handle the same gun in the same aisle two days earlier.

[2] In at least one instance, an unsecured pellet gun in a Walmart store had caused consternation. Two months earlier, a customer emailed Walmart to alert it to the fact that two young boys had loaded a pellet gun and pointed it in his direction. The customer asked Walmart to secure pellet guns just like firearms, and the stores in his area seem to have complied.

[3] None of what Ritchie told the dispatcher or what the dispatcher told police was correct.

A few minutes later, two Beavercreek police officers, Sean Williams and David Darkow, arrived at the store. Darkow instructed the Walmart greeter to seek cover, and the two officers went in search of Crawford. Darkow and Williams "believed that [they] were headed into an active threat, a potential active shooter situation" because they "believed that [Crawford] was loading an assault rifle, pointing it at people and had every intention of shooting up Walmart." R. 134 PID 2991; R. 121 PID 2470–71. Once at the pet department, they found Crawford alone in an aisle, holding what they believed to be a "genuine" AR-15 .223-caliber assault rifle. R. 121 PID 2439; R. 134 PID 2957, 2992. Darkow commanded Crawford to drop the gun and get on the ground.

Darkow testified that Crawford then made a motion to duck behind the endcap of the aisle or dart away. Williams, on the other hand, testified that Crawford was about to point the gun at them and could have quickly shot them. One-and-a-half seconds after Darkow issued his command, Williams shot Crawford. Williams struck Crawford with a second bullet 320 milliseconds later. Crawford died at the hospital shortly after.

Williams testified that he pulled the trigger based on his belief that Crawford was about to point what appeared to be an assault weapon in his direction. Darkow and Williams testified that if Crawford had been holding a boxed pellet gun or a Walmart employee had been assisting him with it, he would not have been shot.

Had it been boxed, the MK-177 would have carried the following warning: "DO NOT BRANDISH OR DISPLAY THIS AIRGUN IN PUBLIC—IT MAY CONFUSE PEOPLE AND MAY BE A CRIME. POLICE AND OTHERS MAY THINK IT IS A FIREARM." R. 186-3 PID 12346. Walmart knew of this warning and that the MK-177 looked like an AR-15 .223-caliber assault rifle. But unlike its policies concerning firearms, Walmart did not require pellet guns to be displayed in a secure manner or to be handled only when assisted by an employee; nor did it train

employees in their sale or display.[4]  Walmart considered the MK-177 to be "no different than any other product . . . in sporting goods."  R. 260 PID 18702.

B.

On December 16, 2014, Sherrod filed this action against Williams, Darkow, the Beavercreek Police Chief, the City of Beavercreek, and Walmart.  The claims against the non-Walmart defendants were resolved.  Sherrod alleged six negligence-based claims—both primary (negligence and premises liability) and derivative (survivorship and loss of consortium)—and a wrongful-death claim against Walmart.  Walmart moved for summary judgment on the primary negligence-based claims and the wrongful-death claim.

The district court denied the motion as to the negligence-based claims but granted it as to the wrongful-death claim, concluding that because Sherrod failed to show that Crawford's death "was *provoked* by [Walmart's] act or omission," the latter claim fails under Ohio law.  R. 273 PID 20014–15, 20018–19 (quoting *Monnin v. Fifth Third Bank of Miami Valley, N.A.*, 658 N.E.2d 1140, 1150 (Ohio Ct. App. 1995)).  The district court held that although "Walmart's alleged negligence may have created the situation that led to Crawford's death, Wal-Mart's alleged 'provocation' is simply too attenuated to support a wrongful death claim."  R. 273 PID 20018.

Sherrod moved for reconsideration—which the district court denied—and, alternatively, to enter final judgment on the wrongful-death claim pursuant to Federal Rule of Civil Procedure 54(b).  The district court entered final judgment to allow immediate appeal on the wrongful-death claim.  Sherrod timely appealed.

---

[4] When pellet guns are returned, however, Walmart requires a manager to be notified and the pellet gun to be unloaded outside, after which an employee will transport the pellet gun inside and process the return.

II.

Although neither party challenges the district court's certification of the wrongful-death claim under Rule 54(b), we lack appellate jurisdiction if the certification was improper. *Lowery v. Fed. Express Corp.*, 426 F.3d 817, 820 (6th Cir. 2005). Rule 54(b) is "designed to facilitate the entry of judgment on one or more claims, or as to one or more parties, in a multi-claim/multi-party action." *Gen. Acquisition, Inc. v. GenCorp, Inc.*, 23 F.3d 1022, 1026 (6th Cir. 1994) (quoting *Solomon v. Aetna Life Ins. Co.,* 782 F.2d 58, 60 (6th Cir.1986)). Proper certification requires two conditions: a district court must "direct the entry of final judgment as to one or more, but fewer than all the claims or parties"; and it must "expressly determine[] that there is no just reason for delay." Fed. R. Civ. P. 54(b); *Gen. Acquisition*, 23 F.3d at 1026. We review the first condition de novo and the second for abuse of discretion. *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 273 (6th Cir. 2019).

A.

Multiple claims are stated when "a claimant's possible recoveries are more than one in number and not mutually exclusive," *Gen. Acquisition*, 23 F.3d at 1029 (internal quotation marks omitted), as is the case "when the facts give rise to more than one legal right or cause of action," 10 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2657 (4th ed.), or when "each count seeks to recover damages that stem from separate injuries," *In re Fifth Third*, 925 F.3d at 273–74. Under Ohio law, although Sherrod's negligence-based claims and her wrongful-death claim share the same set of underlying facts, these facts give rise to two independent causes of action. *Thompson v. Wing,* 637 N.E.2d 917, 922–23 (Ohio 1994). Further, the negligence-based claims Sherrod brings to recover for injuries Crawford suffered before his death are "independent" from the wrongful-death claim in that only the latter seeks to recover for

injuries separately suffered by Crawford's beneficiaries—his sons and parents—as a result of his death.[5] *Peters v. Columbus Steel Castings Co.*, 873 N.E.2d 1258, 1260-61 (Ohio 2007); Ohio Rev. Code Ann. § 2125.02(A)(1) (stating that a wrongful-death action may be brought for the "exclusive benefit" of the decedent's surviving spouse, children, and parents). Thus, the wrongful-death claim is distinct from the negligence-based claims remaining below.

The two sets of claims also involve distinct parties. To be sure, the same nominal party—Sherrod, as personal representative—must bring the negligence-based claims as well as the wrongful-death claim. *Id.* Yet "survival claims and wrongful-death claims are distinct claims that belong to separate individuals, even though they are generally brought by the same nominal party (the personal representative of the estate)." *Id.* at 1262. Because a wrongful-death claim does not arise during a decedent's lifetime, the real parties in interest are Crawford's beneficiaries, not Crawford's estate. *Thompson*, 637 N.E.2d at 922–23.

Lastly, in concluding that Sherrod failed to show that Crawford's death was provoked by Walmart's alleged omissions, the district court "provided an ultimate disposition of the [wrongful-death] claim" and thus satisfied the finality requirement of Rule 54(b) and 28 U.S.C. § 1291. *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 443 (6th Cir. 2004) (internal quotation marks omitted). As alleged here, Sherrod's wrongful-death claim would fail as a matter of Ohio law without a showing of provocation, the only issue on appeal. Because provocation is not an issue in a

---

[5] We also note that of all the parties, only Crawford's sons could likely recover under both sets of claims, *see* Ohio Rev. Code Ann. §§ 2105.06(A), 2125.02(A)(1), but Ohio law does not appear to require his sons to elect to pursue one claim or the other.

negligence claim, the findings leading to the disposition of a wrongful-death claim differ from the findings leading to the disposition of a negligence-based claim in this case. [6]

In sum, the district court did not err in directing entry of final judgment as to Sherrod's wrongful-death claim.

B.

The district court began its no-just-reason-for-delay analysis by explicitly recognizing the list of factors we have instructed courts to consider, *see Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 503 (6th Cir. 2012), and proceeded to balance them. The district court explained that the "discrete issue" of whether Walmart's alleged omissions caused an excited state of mind in Williams may be decided independently from the unadjudicated issues of duty, breach of duty, and proximate cause and therefore would not have to be considered by a second panel of this court. R. 326 PID 20625–26. It also discussed how Sherrod seeks both retrospective and prospective damages, and because the latter are only available by means of a wrongful-death claim, the need for appellate review regarding this claim is not likely to be mooted.

The district court noted the absence of any claim or counterclaim that might result in a set-off against any future judgment on the wrongful-death claim. Finally, the district court explained that resolution of the wrongful-death claim "is a major stumbling block to settling the case" given the significantly different damages calculations for the adjudicated and unadjudicated claims, and concluded that judicial economy weighed in favor of determining, on immediate appeal, whether

---

[6] We note, of course, that "wrongful-death claims share many of the same issues as survival claims asserted against the same defendant," *Peters*, 873 N.E.2d at 1262, and pursuing one claim but not the other could implicate collateral-estoppel principles in certain instances, *see, e.g.*, *Thompson*, 637 N.E.2d at 923 ("Because the beneficiaries are in privity with the decedent, they are collaterally estopped from relitigating issues that were decided in the decedent's own action.").

Sherrod may pursue damages for all of her claims, even if this resulted in further delay with respect to the negligence-based claims. R. 326 PID 20624–26.

The district court's assessment of the equities was not clearly unreasonable. It explained in detail why immediate review of Sherrod's wrongful-death claim is desirable, and its reasoning is supported by the record. Thus, it did not abuse its discretion in finding no just reason for delay. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980); *Gavitt v. Born*, 835 F.3d 623, 639 (6th Cir. 2016).

Accordingly, certification of Sherrod's wrongful-death claims under Rule 54(b) was proper, and we have jurisdiction to entertain the appeal.

III.

We review a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in that party's favor. *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 497 (6th Cir. 2022). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A.

Ohio's wrongful-death statute, provides, as relevant here, that:

> No action for the wrongful death of a person may be maintained against the owner or lessee of the real property upon which the death occurred if the cause of the death was the violent unprovoked act of a party other than the owner, lessee, or a person under the control of the owner or lessee . . . .

Ohio Rev. Code Ann. § 2125.01. The Ohio Court of Appeals has interpreted this provision to bar "a wrongful death action brought against the owner or operator of a premises for a death caused by the violent act of a third person while on the premises" unless "the cause was *provoked* by the owner or operator's act or omission." *Monnin*, 658 N.E.2d at 1150 (emphasis in original); *see also*

*Christian v. Wal-Mart Stores E., L.P.*, No. 11CA002, 2011 WL 2739645, at *8 (Ohio Ct. App. 2011). Based on the dictionary definition of "provoke"—to excite, stimulate, arouse, irritate, or enrage—whether "provocation" has occurred in the wrongful-death context depends on whether the alleged act or omission results in a third person killing an invitee "out of an excited state of mind." *Monnin*, 658 N.E.2d at 1150 (citing *Black's Law Dictionary* 1225 (5th ed. 1990)).

In *Monnin*, the court considered wrongful-death claims brought against Fifth Third Bank for shootings during a robbery.[7] *Id.* at 1144. Sean Michael visited a Fifth Third branch twice in one day. *Id.* The first time, he asked Thelma Leonard, a bank employee, to change a bill. *Id.* The second time, he asked to open a savings account. *Id.* After giving Leonard his name, address, Social Security number, and driver's license, Michael stood up, brandished a gun, and announced that he was robbing the bank. *Id.* Leonard immediately pleaded with him, stating that she knew his mother. *Id.* After Michael emptied Leonard's cash drawer and the drive-through bag that Marjorie Monnin, another bank employee, had been carrying, Michael ordered Leonard, Monnin, and Thomas Lewis—the sole customer in the bank—into the employees' lounge room. *Id.* at 1144–45. He shot all three, killing Lewis and Monnin. *Id.* at 1145.

In addition, evidence established that the same branch had faced two other armed robberies in the past fifteen years—one about two-and-a-half years earlier—and the branch had been out of compliance with federal security-training requirements for at least two years prior to the shootings. *Id.* at 1144, 1147. Fifth Third's security officer also testified that employee conduct during bank robberies may increase the risk of injury and that employees should be instructed to avoid any action that might agitate a robber. *Id.* at 1147. Leonard testified that she had never been instructed

---

[7] There were three separate Fifth Third defendants, but because dismissal of the wrongful-death claims was reversed as to all three for the same reason, *Monnin*, 658 N.E.2d at 1151, 1154, we refer to them collectivity as "Fifth Third" for the sake of ease.

by Fifth Third to avoid using the name of a bank robber or alerting him that she could otherwise identify him. *Id.* at 1147–48.

Based on this record, the *Monnin* court determined that a reasonable jury could find that Leonard's remark to Michael that she knew his mother resulted in him "acting out of an excited state of mind brought about by a fear that he would be identified" and, thus, provoked him to shoot Lewis and Monnin. *Id.* at 1150. The court also stated that the remark might have occurred because Fifth Third "failed to instruct [Leonard] not to make such statements." *Id.* at 1150, 1154. The court therefore reinstated the wrongful-death claims against Fifth Third. *Id.* at 1151, 1154.

B.

Here, the district court concluded that *Monnin* gives "rise to an inference that the relevant 'act' [of provocation] must be an immediate, direct cause of the third party's decision to use violence." R. 326 PID 20617. Walmart agrees, arguing that there must be an affirmative act by the property owner to establish liability under *Monnin*.[8] Sherrod disagrees, however, arguing that *Monnin* allows a wrongful-death claim to be based on a property owner's omission as well, such as Walmart's failure to prevent Crawford from carrying a pellet gun closely resembling an AR-15 through the store and among customers.[9]

---

[8] We note that most of Walmart's brief focuses on whether Walmart owed a duty to Crawford, whether it breached that duty, and whether Crawford's death was foreseeable—i.e., whether Walmart was negligent. Walmart asks us to affirm the district court's dismissal of Sherrod's wrongful-death claim on one of these grounds in lieu of determining the issue of provocation to avoid making "a precedent-setting interpretation of Ohio law." Walmart Br. at 11. We reject this approach. First, the cases Walmart cites in support deal with situations in which no state court had considered the issue. Here, however, the Ohio Court of Appeals has considered the issue of provocation in the wrongful-death context, which is "relevant data . . . to predict a state court's disposition of a given controversy." *Rousey v. United States*, 115 F.3d 394, 397 (6th Cir. 1997) (internal quotation marks omitted). Further, under Rule 54(b), these negligence-specific issues are not properly before us. We have one certified claim. The remaining issues are still before the district court. *See Justice v. Pendleton Place Apartments*, 40 F.3d 139, 141 (stating that "a court of appeals should not entertain appeals on issues that are still before the trial court").

[9] Sherrod also argues that if a reasonable jury could conclude that Walmart proximately caused Crawford's death—which the district court determined to be the case—it could "automatically" conclude that Williams was

Sherrod is correct. *Monnin* held that an omission by a property owner may give rise to liability, specifically a failure to prevent the act giving rise to the third person's excited state of mind from occurring in the first place, such as Fifth Third's failure to instruct Leonard not to alert bank robbers that she could identify them. 658 N.E.2d at 1150, 1154. Further, another Ohio appellate court, citing and quoting *Monnin*, considered whether Walmart's alleged failure to properly design a parking lot gave rise to an excited state of mind in a driver who veered onto a sidewalk at a high rate of speed and killed a pedestrian. *Christian*, 2011 WL 2739645, at *1, *7-8. Although the court affirmed the trial court's grant of summary judgment, it did so because the evidence established that Walmart had made numerous markings and posted signage to warn drivers to slow down, so reasonable minds could not conclude that any omission by Walmart "created a 'drag strip' which provoked the accident." *Id.* at *2, *8. The court did not base its decision on any failure of the plaintiff to allege a direct and immediate act by Walmart.

C.

Based on *Monnin* and *Christian*, the dispositive provocation question here is not whether Walmart affirmatively acted to provoke Williams. It is whether a reasonable jury could conclude that Walmart's failure to prevent Crawford from carrying what looked like an assault rifle through the store and among customers created an excited state of mind in Williams which caused him to shoot and kill Crawford.

The record supports the following. At the time of Crawford's death, Walmart had no policies in place to prevent customers from picking up unsecured and unboxed pellet guns—like

---

provoked by Walmart. Sherrod Br. at 36, 39. We disagree. *Monnin* instructs that a jury must consider the issue of provocation separately from the issue of proximate cause. 658 N.E.2d at 1150. One does not "automatically" follow from the other. Proximate cause and provocation are distinct concepts and requirements, as ably explained by our dissenting colleague.

the MK-177, a replica of an AR-15—and carrying them around the store without employee supervision. Walmart did not train employees to respond to such situations if they caused any alarm. Walmart knew that a pellet gun had frightened at least one customer and that the MK-177 could confuse police into thinking it was a real firearm. Williams testified that he believed Crawford was holding a genuine AR-15, and that he pulled the trigger because he thought that Crawford was turning towards him in a threatening manner with an assault rifle. Video capturing the moment when Williams shot Crawford suggests that Williams did so immediately upon seeing him, even though it was "business as usual" in the store and Crawford was simply standing in the aisle with the gun pointed down and talking on his phone, which suggests that Williams acted in a panic or, at minimum, without thinking.

Williams also testified that had he known that Crawford was holding a pellet gun, not an assault rifle, he would not have fired the deadly shots. According to Williams, he would not have shot Crawford had he been holding a boxed pellet gun or if a Walmart employee had been assisting him with the MK-177.

Our dissenting colleague concludes that Walmart's alleged negligence was not the immediate, direct, and predominant cause of the shooting, and therefore Walmart did not provoke the shooting within the meaning of O.R.C. § 2125.01. We believe a jury could find differently. On this evidence, a reasonable jury could find that Walmart failed to prevent Crawford from carrying a look-alike AR-15 openly around the store—an act it knew could alarm other customers and confuse the police because such guns look like actual firearms—and that this omission created an excited state of mind in Williams, who fatally shot Crawford because he feared that the gun he believed was being turned towards him was a genuine assault rifle. Thus, a reasonable jury could find provocation as required by the statute.

\* \* \*

For the foregoing reasons, we REVERSE the district court's dismissal of Sherrod's wrongful-death claim and REMAND for further proceedings consistent with this opinion.

Case No. 21-3428, *Sherrod v. Wal-Mart Stores, Inc.*

**ALICE M. BATCHELDER, Circuit Judge, dissenting.** I would affirm the district court's grant of summary judgment to Walmart on Sherrod's wrongful-death claim, which she brought pursuant to Ohio Revised Code § 2125.01. Therefore, I respectfully dissent.

**I.**

Walmart sells real firearms. They are strictly regulated. Walmart keeps them locked behind a counter, accessible only to specific employees, and has additional precautions.

Walmart also sells "Crosman MK-177 pellet rifles," which are air guns designed to look like real AR-15 semi-automatic assault rifles. Unlike other toy guns, which have an orange plastic cap on the barrel so that they can be distinguished from real guns, MK-177s have no orange cap. At Walmart, MK-177s are not secured in any way. They are displayed for sale on shelves in the sporting goods department. Crosman sends the MK-177s to Walmart packaged in a box intentionally designed so the customer can open the lid, remove the MK-177, and handle it in the store, before deciding whether to buy it. The box contains a warning that says: "DO NOT BRANDISH OR DISPLAY THIS AIRGUN IN PUBLIC – IT MAY CONFUSE PEOPLE AND MAY BE A CRIME. POLICE AND OTHERS MAY THINK IT IS A FIREARM."

At 8:09 p.m. on August 5, 2014, John Crawford, a 22-year-old black man and father of two, entered a Walmart store. At 8:18 p.m., he picked up an unboxed MK-177 from a shelf in the sporting goods department. In the surveillance video, Crawford is talking on his cell phone and appears to simply pick up the MK-177 as he walks past it, barely breaking stride. There is no indication that he stopped, put the phone down, or opened a box to remove the MK-177. In a video from two days earlier (August 3, 2014), other customers appear to be holding the same or a similar unpackaged MK-177 in the same aisle where Crawford picked it up on August 5. Despite their having the MK-117 in hand, out of its package, nobody shot any of these customers.

Crawford left the sporting goods department carrying the unboxed MK-177 and headed toward the pet department. Corey Brooks, a Walmart employee working in the adjacent paint department, saw Crawford and worried that someone might mistake the MK-177 for a real gun. Brooks called another employee, Michaela Menz, and asked her to tell management so they could locate Crawford and prevent a misunderstanding. Menz immediately paged a manager.

Within minutes, at 8:21 p.m., two Walmart managers, Denise Wolford and Jessica Thomas, were searching the store for Crawford. When they did not find him in the sporting goods department, they walked toward the grocery section to look for him there. Thomas testified that she did not believe that Crawford posed any immediate danger, so she did not treat this as an urgent situation. Unknown to these two managers, at about that same time, Ronald Ritchie, a Walmart shopper, saw Crawford with the MK-177, thought it was a gun, and called 911.

Ritchie falsely told the 911 operator that a black man was in the Walmart pet department, waving a black assault rifle, threatening people and children, and trying to load the rifle.

Beavercreek Police Officers Sean Williams and David Darkow responded to the dispatch. The dispatcher told them that the suspect was a black man and the gun was loaded.

The two officers entered the Walmart at 8:26 p.m. (just eight minutes after Crawford first picked up the MK-177), anticipating an "active shooter" situation. The Walmart managers had not located Crawford, nor did they know that the police had been called. When the officers entered the Walmart, nothing appeared amiss. They quickly found Crawford in the pet department, where he stood facing the shelves. In his right hand, he was holding what appeared to be an AR-15 semiautomatic assault rifle, with the muzzle pointed at the floor. In his left hand, the hand closest to the officers, he was holding a cell phone to his ear. The officers say they did not see the phone.

Officer Darkow yelled "Drop the gun!"  One second later, just as Crawford turned his head to look at Darkow, Officer Williams fired two shots, killing Crawford.  Williams claimed that Crawford was turning toward them in an aggressive manner.  The video disproves this.

**II.**

Tressa Sherrod, the Executrix of Crawford's estate, sued the Officers, the Beavercreek Police Chief, and the City of Beavercreek, asserting numerous federal and state law claims.  Those claims all settled.  Sherrod also sued Walmart, asserting state-law claims for negligence, premises liability, survivorship, loss of consortium, and wrongful death.  The district court accepted supplemental jurisdiction over these claims based on the now-settled federal claims.

Walmart moved for summary judgment.  The district court granted summary judgment on the wrongful-death claim, explaining that the claim was governed by an Ohio statute and an interpretation of that statute by an Ohio appellate opinion, which is the only on-point opinion.

The statute provides, in relevant part:

> No action for the wrongful death of a person may be maintained against the owner or lessee of the real property upon which the death occurred if the cause of the death was the violent *unprovoked* act of a party other than [an employee], unless the acts or omissions of [an employee] constitute gross negligence.

O.R.C. § 2125.01 (emphasis added).

In *Monnin v. Fifth Third Bank*, 658 N.E.2d 1140 (Ohio App. 1995), a bank employee told an armed robber that she knew his mother, and thereafter, the robber shot and killed two people. In analyzing a wrongful-death claim brought against the bank, the *Monnin* court held:

> [O.R.C. § 2125.01] bar[s] a wrongful death action brought against the owner or operator of a premises for a death caused by the violent act of a third person while on the premises[,] unless
>
> (1) the *cause* proximately resulted from the gross negligence of the owner or operator, or
>
> (2) the cause was *provoked* by the owner or operator's act or omission.

*Monnin*, 658 N.E.2d at 1150 (emphasis in original; paragraph breaks inserted). The *Monnin* court's use of passive voice, double negatives, and the word "cause," with inconsistent emphasis, leaves this passage a bit muddied. So, consider the same passage reconstructed this simplified way:

> [O.R.C. § 2125.01 does not] bar a wrongful death action [] against the owner or operator of a premises for a death caused by the violent act of a third person while on the premises [if the wrongful death was]
>
> (1) [] proximately [caused by] the *gross negligence* of the owner or operator, or
>
> (2) [] *provoked* by the owner or operator's act or omission.

*See id*. The *Monnin* court elaborated on the meaning of "provoked," explaining:

> *Whether provocation has occurred looks to the act which is alleged to be provocation and to the result it creates*, not to the purposes or motivation of the person who offers the alleged provocation. Thus, the provocation may be intentional or it may be inadvertent. . . . [T]he act or acts which provoke the cause of death may be negligent as well as intentional for purposes of R.C. 2125.01.

*Id*. (emphasis added). The *Monnin* court held that even though the bank employee had no malicious purpose, her announcement that she knew the robber's mother might have led the robber to fear that he could be identified and thus provoked him to shoot the two victims. *Id*.

### III.

In arguing the motion to the district court, Sherrod did not contend that Walmart was *grossly* negligent. She argued that Walmart's ordinary negligence provoked the shooting. But the district court, applying § 2125.01 and *Monnin*, held that no reasonable juror could find, based on the evidence presented, that Walmart had "provoked" Officer Williams to shoot Crawford—even accepting that the Walmart employees' acts and omissions were a proximate cause of Crawford's death, those acts or omissions did not "provoke" Officer Williams to use deadly force.

Sharrod presented no claim or evidence that any Walmart employee had committed any act that *affirmatively* provoked Officer Williams to shoot Crawford. In fact, the Walmart

employees who were aware that Crawford had the MK-177 (and were searching for him to prevent a misunderstanding) were unaware of the 911 call and the responding officers; the employees who were aware of the responding officers were unaware of Crawford or a possible problem.

At most, the Walmart employees were negligent in failing to employ better precautions for the look-alike MK-177s, failing to properly recover this unpackaged MK-177 and return it to its package, and failing to urgently locate Crawford before the police did. Sherrod claimed that these failures caused Officer Williams to mistakenly believe that Crawford had an armed gun, which caused Officer Williams to use deadly force. That is, she claims "causation" is "provocation."

Working her theory backwards, Sherrod argued that Officer Williams would not have used deadly force but for his belief that Crawford had a real, loaded gun. Fair enough, though Officer Williams testified that he shot Crawford because (he mistakenly believed that) Crawford turned toward him with the gun in an aggressive manner, which led him to fear for his own safety and that of others. Officer Williams further testified that, because Ohio is an "open carry" state, Crawford was legally entitled to carry a real, loaded gun inside the Walmart, so Crawford's merely holding the gun—even a real, loaded gun—was not enough to cause him to shoot Crawford.

But proceeding from the reasonable premise that Officer Williams would not have shot Crawford if he had known the gun was neither real nor loaded, Sherrod argued that Officer Williams would not have mistakenly believed the gun was real and loaded but for the negligence of the Walmart employees (in failing to manage the look-alike MK-177s, return this one to its box, and locate Crawford before the officers did). But the district court also considered the misinformation reported by the 911 caller and the 911 dispatcher; that Officer Williams mistakenly believed it was an "active shooter" situation despite no indication of that from anyone at the Walmart entrance when he arrived; and that Officer Williams shot Crawford within one second of

confronting him. And, at the time of the shooting, Officer Williams had no basis to know that Crawford had picked up the gun inside the Walmart and had not carried it in with him.

The district court concluded that the "alleged 'provocation' [wa]s simply too attenuated to support a wrongful death claim under Ohio law." *Sherrod v. Wal-Mart Stores, Inc.*, No. 3:14-cv-454, 2021 WL 534613, at *5–6 (S.D. Ohio, Feb. 12, 2021) (citations omitted).

**IV.**

On appeal, Sherrod argues that, in the context of O.R.C. § 2125.01 and *Monnin*, the word "provoke" means *any* breach of duty by an employee that contributes to the third party's lethal act. Apt. Br. at 36. That is, any concurrent proximate cause is a provocation; it may be either an act or an omission, and it need not be immediate, direct, or predominant. Apt. Br. at 36-37.

Recall that *Monnin* held that "provocation" does not require intent; an employee's inadvertent act or failure to act that breaches a duty can be provocation. *Monnin*, 658 N.E.2d at 1150. There, the statement "I know your mother," with which the employee intended to diffuse the situation, might have instead inflamed the situation by alarming the robber, so that statement breached the employee's duty not to inflame the situation and put the customers at risk.

Sherrod's two-part theory is that: Walmart's duty to its customer was to prevent (or not allow) the police officers responding to a 911 call to mistakenly think that a toy gun, out of its package, was a real and loaded gun; and Walmart breached that duty by allowing Officer Williams to think that the MK-177 that Crawford was holding was real and loaded.

In its analysis, the district court emphasized that the bank employee's breach of duty in *Monnin* was immediate, direct, and predominant. Thus, in the district court's view, the bank employee's negligent statement in *Monnin* was not merely one of many links in the causal chain between the bank's duty of care to the customers and the third-party's deadly shooting, it was

qualitatively more. Thus, the district court distinguished *Monnin* from the present facts on the basis that, while the Walmart employees' negligence was a link in the causal chain between Walmart's duty of care to Crawford and Officer Williams's deadly shooting, that negligence did not set off the shooting (not immediate), was not revealed to Williams, the shooter (not direct), and was not the only or even foremost reason that Williams shot Crawford (not predominant).

Sherrod argues that those differences do not matter, and that *Monnin* did not expressly require that the negligence be immediate, direct, and predominant, so neither should we. But the mere fact that *Monnin* did not expressly require those qualifiers does not mean that Sherrod is correct that "provocation" means "*any* breach of duty by an owner/employee that *contributes to* the third party's lethal act"; i.e., that "provocation" is no more than "proximate cause." Consider what happens if we substitute "proximately caused" for the word "provoked" in the simplified version of *Monnin*'s reformulation of O.R.C. § 2125.01, discussed above:

> O.R.C. § 2125.01 does not bar a wrongful death action against the owner or operator of a premises for a death caused by the violent act of a third person while on the premises if the wrongful death was
>
> (1) proximately caused by the *gross negligence* of the owner or operator, or
>
> (2) ~~provoked~~ [proximately caused] by the owner or operator's act or omission.

*See Monnin*, 658 N.E.2d at 1150. This substitution excises "gross negligence" from the rule. And reconsidering the statute in this way—with this same substitution—results in:

> No action for the wrongful death of a person may be maintained against the owner or lessee of the real property upon which the death occurred if the cause of the death was the violent ~~unprovoked~~ act of a [third] party [], unless the acts or omissions of [an employee] [were a proximate cause of the violent act; or] constitute gross negligence.

*See* O.R.C. § 2125.01. Again, this "proximate cause" option swallows the "gross negligence" alternative. It is doubtful that the legislature meant "ordinary negligence" (or "proximate cause") when it referred to "provocation" while also specifically requiring "*gross* negligence."

Provocation must be different from proximate cause. And I think the district court was correct that, when considered in its ordinary meaning and as applied in *Monnin*, provocation means that the employee's negligence must have been immediate, direct, and predominant.

Here, the Walmart employees' apparent negligence—failing to employ better precautions for the look-alike MK-177s, failing to properly recover this unpackaged MK-177 and return it to its package, and failing to urgently locate Crawford on the night of the shooting—was not the immediate, direct, and predominant cause of Officer Williams's deadly shooting.

Officer Williams did not shoot Crawford just because Crawford was holding an MK-177 without its box. To the contrary, Officer Williams testified that, because Ohio is an "open carry" state, Crawford was legally entitled to carry a real, loaded gun inside the Walmart, so Crawford's merely holding the gun—even a real, loaded gun—was not enough to cause him to shoot Crawford. According to Officer Williams, he shot Crawford because Crawford turned toward him with the gun in an aggressive manner, which led him to fear for his own safety and that of others. Based on this testimony, the Walmart employees' alleged negligence did not provoke the shooting.

Because the majority sees this differently, I respectfully dissent.